UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| RAYMOND G. CHAPMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 04-CV-0859-CVE-FHM |
| | ) | |
| CHASE MANHATTAN MORTGAGE | ) | |
| CORPORATION, (a/k/a J.P. Morgan, | ) | |
| Chase Home Finance, CMMC, Chase); | ) | |
| GERRI SMITH, CASEY BEARD (Executive | ) | |
| Resolution Board); STEPHANIE HARDIN | ) | |
| (CHG-Productivity and Quality Division); | ) | |
| and ROD REUSCHER (Asst. VP and | ) | |
| Customer Relations Contact), | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Now before the Court is Defendant Chase Manhattan Mortgage Corporation's Motion for
Summary Judgment and Brief in Support (Dkt. # 158). Recognizing that plaintiff is proceeding pro
se, the Court has construed the amended complaint broadly and finds that it raises at least sixteen
separate legal claims.[1] Defendant Chase Manhattan Mortgage Corporation ("Chase") requests that
the Court enter summary judgment as to all of plaintiff's claims.

---

[1]     Plaintiff has filed an unauthorized sur-reply in opposition to defendant's motion for
summary judgment (Dkt. # 195), and defendant has filed a motion to strike the sur-reply
(Dkt. # 201).  Although plaintiff is proceeding pro se, he must still abide by the Federal
Rules of Civil Procedure and, in order to file a sur-reply, plaintiff must request permission
from the Court to file supplemental briefing.  LCvR 7.2(h).  Plaintiff did not request
permission to file a supplemental brief and defendant's motion to strike is **granted**.  The sur-
reply (Dkt. # 195) is stricken and the Court will not consider it when ruling on defendant's
motion for summary judgment.

**I.**

Plaintiff Raymond Chapman ("Chapman") executed a note and mortgage with Pinnacle Mortgage Corporation ("Pinnacle") on November 19, 1997 to purchase his home.  On the same day, Pinnacle assigned the note and mortgage to Chase.  Rose Damilao ("Damilao") lived with Chapman from February 2001 to October 2004, and she managed many of Chapman's financial affairs from September 2001 to August 2003.  Damilao would write checks for Chapman's bills and Chapman would sign the checks before the bills were sent.  Chapman specifically authorized Damilao to make mortgage payments to Chase and she had authority to communicate with Chase on plaintiff's behalf concerning the mortgage.

Problems arose in June 2002 when Chapman's mortgage payment was returned due to insufficient funds.  The check ("June 2002 check"), number 1911, was signed by Chapman on May 30, 2002 and was drawn from his bank account with Tulsa Teachers Credit Union ("TTCU").  Chase initially credited the June 2002 check toward Chapman's mortgage on June 8, 2002, but Chase subsequently reversed the credit on July 8, 2002 after the June 2002 check bounced.  A review of Chapman's bank records confirms that plaintiff was charged a $15 fee on two separate occasions for writing the June 2002 check without sufficient funds.[2]  TTCU stamped the following notation on the June 2002 check: "INSUFFICIENT FUNDS: This check has been returned a second time. Please do not re-deposit as cash item."  Dkt. # 158, Ex. 7.

---

[2]     The amount of the June 2002 check was $556.  At the time TTCU first attempted to process the June 2002 check, Chapman had $496 in his checking account.  The second time that TTCU attempted to draw funds from Chapman's account, he had $525 in his checking account.

Chapman has made conflicting statements about the June 2002 check.  In response to requests for admission, he admits that the June 2002 check "was unpaid due to insufficient funds." Id., Ex. 4, at 1.  During his deposition, Chapman acknowledged that the June 2002 check was returned for insufficient funds.  Id., Ex. 5, at 102-03.  However, he refers to an "alleged" missing payment in June 2002 in his response to defendant's motion for summary judgment, and he does not admit that the June 2002 check was returned for insufficient funds.  He claims that Chase assured him that it made a bookkeeping error, and he states that Chase sent him a letter on July 5, 2002 informing him that his "account is paid through the July 1, 2002 payment."  Dkt. # 190, Ex. 17. Chase's records show that it did not receive final notice that the June 2002 check bounced until July 8, 2002, and Chase would not have known about the bounced check when it sent the letter to Chapman on July 5, 2002.[3]

Damilao states that she received notice from TTCU that the June 2002 check bounced, and she conveyed this information to Chapman.[4]  She was authorized to talk to Chase and she contacted Chase to discuss the matter.  Chase's phone records show that it called Chapman several times to resolve the matter of the missing June 2002 payment, but Chapman denied that he was behind on his mortgage.  Starting on July 17, 2002, Chase began calling Chapman to collect the missing

---

[3]     The July 5, 2002 letter was sent to Chapman to clear up a credit that was mistakenly applied to his account.  Chase states that another customer's payment of $1,011.61 was incorrectly credited to Chapman's account, and the July 5, 2002 letter was sent to Chapman to inform him of this error.

[4]     Chapman asks the Court to disregard Damilao's deposition testimony as the "statement[s] of a well established liar as well as a woman scorned."  Dkt. # 163, at 11.  At the summary judgment stage, the Court is not weighing witness credibility, but is simply determining whether there is a genuine issue of material fact.  If Chapman's lawsuit survives summary judgment, Damilao's credibility will be an issue for the jury to determine.

payment, but Chase did not actually talk to Chapman until July 23, 2002.  Chapman accused Chase

of harassing him and he denied any knowledge that the June 2002 check bounced.  On September

23, 2002, Chase notes that an "escalated call" occurred, and Chapman demanded to speak to a

supervisor. Dkt. # 158, Ex. 12, at 2.  Chapman again denied that the June 2002 check was returned

for insufficient funds and he claimed that the alleged missing payment was the result of Chase's

bookkeeping error.  He threatened to sue Chase and hung up.  Chapman called Chase on November

25, 2002 asking why his payment history showed that he was one month behind on his mortgage

payments, and Chase explained that the June 2002 check was returned for insufficient funds.  During

this time, Chase also sent Chapman several letters explaining that Chapman failed to make a

payment for June 2002.

Chapman subsequently enrolled for automatic withdrawal of his mortgage payment to

alleviate any problems caused by Chase's "substandard bookkeeping practice[s]," and he continued

to deny that he was behind by one payment. Dkt. # 163, at 6.  In February 2003, Chapman states

that he attempted to refinance his loan through Harry Mortgage Company, because he wanted to "get

away" from Chase.  Id. at 7.  Chapman claims that Chase ruined his credit by erroneously reporting

that he was behind on his mortgage payments, and Chapman was unable to refinance his mortgage

because of his poor credit score.  Chapman reapplied to Harry Mortgage Company in September

2003, and his application was again denied because of his credit score.  Chapman alleges that he

continued to have problems with Chase's bookkeeping, because Chase was not recording his

payments in a timely manner.  Specifically, Chapman cites three incidents to support his claims that

Chase repeatedly mishandled payments: (1) Chase made a clerical error when it used the wrong

account number to process a check-by-phone in February 2003; (2) Chase did not timely process

4

Chapman's January 2004 payment and he subsequently stopped payment on the check;[5] and (3) Chase improperly returned his September and October 2004 payments.[6] Chapman filed a complaint in February 2004 with the Better Business Bureau in Ohio concerning his problems with Chase.

On September 23, 2004, Chase sent Chapman a letter notifying him that he had defaulted on his loan and Chase demanded that Chapman pay then entire balance due under the note and mortgage.  When Chapman failed to pay the full amount, Chase instituted a foreclosure action against Chapman in state court.  That action, Chase Manhattan Mortgage Corp. v. Chapman, Case No. CJ-2004-6537 (Tulsa County District Court), is now stayed pending resolution of this case. Chapman filed this case alleging 17 separate claims against Chase, and these claims fall into three general categories: "(1) Chase wrongfully instituted foreclosure proceedings against Chapman in this matter; (2) Chase reported erroneous information on Plaintiff's credit report; and (3) Chase caused severe emotional damage."  Dkt. # 163, at 2.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  The plain language of Rule 56© mandates

---

[5]     Chase has produced a copy of the check showing that it was received and processed on February 9, 2004.  Plaintiff had previously stopped payment on the check on February 3, 2004, and Chase was not able to receive payment on the check.  This caused Chase to list the January 2004 payment as overdue.

[6]     Chase sent Chapman a demand letter for the full amount of the mortgage on September 23, 2004 because Chapman defaulted on the loan.  Chase states that it declined to accept "partial payments" once it had declared Chapman's account in default.  Dkt. # 190, at 10.

the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex, 477 U.S. at 317. "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996).  "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Durham v. Xerox Corp., 18 F.3d 836, 838-39 (10th Cir. 1994).

"When the moving party has carried its burden under Rule 56©, its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff."  Anderson, 477 U.S. at 252.  In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 250.  In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

**III.**

Chapman's amended complaint appears to allege many bases for relief.  Consistent with Supreme Court and Tenth Circuit precedent, the Court will construe his <u>pro se</u> pleadings liberally when ruling on Chase's motion for summary judgment.  <u>Haines v. Kerner</u>, 404 U.S. 519, 520 (1972); <u>Gaines v. Stenseng</u>, 292 F.3d 1222, 1224 (10th Cir. 2002).  "Although '[a] pro se litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers,' . . . 'pro se parties [must] follow the same rules of procedure that govern other litigants.'" <u>Garrett v. Selby Connor Maddux & Janer</u>, 425 F.3d 836, 840 (10th Cir. 2005) (quoting <u>Nielsen v. Price</u>, 17 F.3d 1276, 1277 (10th Cir. 1994)).  Chase argues that Chapman can not prevail under any theory of recovery alleged in his amended complaint and, based on the evidence, summary judgment should be entered against Chapman.[7]

**A.**

Chapman alleges that Chase violated the Oklahoma Consumer Protection Act, OKLA. STAT. tit. 15, § 751 <u>et</u> <u>seq</u>. ("OCPA") by engaging in an unlawful business practice.[8]  The basis for this claim appears to be that Harry Mortgage Company declined to refinance Chapman's mortgage "due

---

[7]  Chapman's response specifically mentions his claim for intentional infliction of emotional distress, but he does not directly refer to any other legal claim.  Even so, the Court will construe the summary judgment record liberally to determine if Chapman can recover under any legal theory alleged in his amended complaint.

[8]  Chapman also uses language suggesting that Chase engaged in a deceptive trade practice, and this could be construed as an attempt to raise a claim under Oklahoma's Deceptive Trade Practices Act, OKLA. STAT. tit. 78, § 51 <u>et</u> <u>seq</u>. ("DPTA").  However, it has been "definitively established that [the DTPA] protect[s] competing business interests and do[es] not present a basis for suit by consumers." <u>Conatzer v. American Mercury Ins. Co., Inc.</u>, 15 P.3d 1252, 1254 (Okla. Civ. App. 2000); <u>see</u> <u>also</u> <u>In re General Motors Corp.</u>, 2005 WL 1924335, at *3 (W.D. Okla. 2005).  Chapman is certainly not Chase's competitor nor has he suffered a competitive injury, and the DPTA does not provide him any basis for recovery.

to the fact that Chase had affected the plaintiff's credit report with their unfounded allegations, clearly in violation of [the OCPA]." Dkt. # 18, at 4.  Chapman may also be suggesting that Chase committed an unfair or deceptive trade practice by initiating a foreclosure action without a valid legal basis.

The OCPA was enacted to protect consumers from unfair and deceptive trade practices and, unlike the Federal Trade Commission Act, it provides a private right of action for aggrieved consumers.  Patterson v. Beall, 19 P.3d 839, 846 (Okla. 2000).  In order to state a claim under the OCPA, a plaintiff must allege four elements: (1) the defendant engaged in an unlawful practice under OKLA. STAT. tit. 15, § 753; (2) the unlawful practice occurred in the course of the defendant's business operations; (3) the plaintiff, in his capacity as a consumer, was injured; and (4) the defendant's unlawful practice caused the plaintiff's injury.  Id.  However, the OCPA expressly excludes certain claims from its coverage, as OKLA. STAT. tit. 15, § 754  provides that "[n]othing in this act shall apply to . . . [a]ctions or transactions regulated under laws administered by the Corporation Commission or any other regulatory body acting under statutory authority of this state or the United States . . . ."  Id.

In Williams v. CSC Credit Services, Inc., 2007 WL 1959219 (N.D. Okla. June 29, 2007), this Court held that a credit reporting agency may not be sued under the OCPA for allegedly stating inaccurate credit information, because this type of claim is exempt from coverage under the OCPA. Id. at *2-3.  The Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. ("FCRA"), was intended to "ensure accuracy and fairness in credit reporting and to require that such reporting is confidential, accurate, relevant, and proper."  Matthiesen v. Banc One Mortgage Corp., 173 F.3d 1242, 1245

(10th Cir. 1999).   Congress has given the Federal Trade Commission ("FTC") administrative authority to enforce the FCRA.   15 U.S.C. § 1681s.   In <u>Williams</u>, this Court held that

> By federal statute, the FTC has the authority to enforce the FCRA, and this Court has not found a meaningful difference between plaintiffs' FCRA and OCPA claims.   The stated purpose of the FCRA was to provide a remedy for alleged errors in credit reporting, and plaintiffs' claim is clearly within the scope of the FCRA.   Therefore, plaintiffs' claims are exempt from coverage under the OCPA, and plaintiffs can not pursue relief under the OCPA . . . .

<u>Williams</u>, 2007 WL 1959219 at *3.   Although <u>Williams</u> dealt with a credit reporting agency instead of a furnisher of credit information, this Court's holding in <u>Williams</u> applies here.

Chapman states that Chase harmed his credit by erroneously reporting that he was one month behind on his mortgage.   This type of claim falls squarely within the FCRA and, under <u>Williams</u>, Chapman's claim under the OCPA is barred.[9]   To extent that Chapman may be alleging that Chase engaged in an unlawful business practice by instituting a foreclosure action, there is no evidence that Chase has wrongfully initiated a foreclosure action.   The question of whether Chase's actions qualify as an unfair or deceptive trade practice under OKLA. STAT. tit. 15, § 753(20) is a question for the Court to decide on a case by case basis.   <u>Patterson</u>, 19 P.3d at 847.   The undisputed facts show that the June 2002 check was returned for insufficient funds and that plaintiff did not make up this payment in subsequent months.   The evidence shows that Chapman defaulted on his loan, and Chase had a good faith basis to file a foreclosure action.   The Court finds that Chase did not engage in an

---

[9]   Chapman has not raised a claim under the FCRA, and this seems to be intentional on Chapman's part.   His original complaint cited the FCRA in an attempt to show that his common law tort claims were not preempted by federal law.   Dkt. # 1, at 13-14.   Defendant cited these allegations in its notice of removal, and Chapman intentionally removed any mention of the FCRA in an attempt to defeat federal question jurisdiction.   The Court noted that the amended complaint "eliminated all reference to federal statutes upon which he might have been relying for relief."   Dkt. # 34, at 2.   Therefore, the Court will not construe the amended complaint to state a claim under the FCRA.

unfair or deceptive trade practice by initiating a foreclosure action when there was a legitimate basis

for so doing.  Chase is entitled to summary judgment on Chapman's OCPA claim.

**B.**

Chapman alleges that Chase committed defamation, libel, false light invasion of privacy, and

slander of credit by reporting inaccurate credit information.  Chase argues that these claims are

preempted by the FCRA, because the "allegations pertain to a subject matter regulated" by the

FCRA.  Dkt. # 158, at 8.  Chapman failed to respond to Chase's motion for summary judgment on

this issue.

The FCRA expressly preempts claims for defamation, invasion of privacy, and negligence

based on the reporting of credit information:

> Except as provided in sections 1681n and 1681o of this title, no consumer may bring
> any action or proceeding in the nature of defamation, invasion of privacy, or
> negligence with respect to the reporting of information against any consumer
> reporting agency, any user of information, or any person who furnishes information
> to a consumer reporting agency, based on information disclosed pursuant to section
> 1681g, 1681h, or 1681m of this title, or based on information disclosed by a user of
> a consumer report to or for a consumer against whom the user has taken adverse
> action, based in whole or in part on the report except as to false information
> furnished with malice or willful intent to injure such consumer.

15 U.S.C. § 1681h(e).  In order to avoid preemption on his claims for invasion of privacy,

defamation, libel, and slander of credit, Chapman must show that Chase acted with malice or willful

intent to violate the FCRA.  Thornton v. Equifax, 619 F.2d 700, 703 (8th Cir. 1980).  The statute

uses the broad language " in the nature of defamation," which encompasses all types of libel and

slander claims relating to the reporting of credit information.  Joiner v. Revco Discount Drug

Centers, Inc., 467 F. Supp. 508, 513-14 (W.D.N.C. 2006); Johnson v. Citimortgage, Inc., 351 F.

Supp. 2d 1368, 1376 (N.D. Ga. 2004).

Construing Chapman's amended complaint liberally, he sufficiently alleges that Chase acted with malice or willful intent.  However, he may not rest merely on the allegations of his pleadings at the summary judgment stage.  Fed. R. Civ. P. 56(e); Geoffrey E. Macpherson, Ltd. v. Brinecell, Inc., 98 F.3d 1241, 1245 (10th Cir. 1996).  In his response, plaintiff states that Chase "illegally attached negative remarks to Plaintiff's credit report" and that he has had "an extremely difficult time of both obtaining credit and rebuilding his credit."  Dkt. # 163, at 2.  However, Chase had a legitimate basis for reporting negative credit information, specifically that Chapman was behind on his mortgage payments.  Beyer v. Firstar Bank, N.A., 447 F.3d 1106 (8th Cir. 2006) (affirming district court's decision to grant summary judgment when the plaintiff failed to present evidence that the defendant actually reported inaccurate credit information).  Although Chapman disagrees with Chase's assessment of his payment history, it is undisputed that the June 2002 check bounced and his payments were one month behind after June 2002.  Even if Chapman could show that Chase's statements were false, in order to prove malice he must show that Chase knew the statements to be false.  Morris v. Equifax Information Servs., LLC, 457 F.3d 460, 471 (5th Cir. 2006).  There is no evidence to support such a finding and, therefore, Chapman's claims for defamation, libel, slander of credit, and false light invasion of privacy are preempted by the FCRA.

## C.

Plaintiff alleges that Chase committed tortious interference with a contract, but he does not specify with which contract Chase may have interfered.  Chapman may be referring to the note and

mortgage between himself and Chase.[10]  However, a party can not tortiously interfere with a contract to which it is a party.  <u>Chouteau v. Enid Memorial Hosp.</u>, 992 F.2d 1106, 1108 (10th Cir. 1993); <u>Freeman v. Sikorsky Aircraft Corp.</u>, 2006 WL 2385311, *4 (N.D. Okla. Aug. 17, 2006); <u>Cohlmia v. Ardent Health Servs, LLC</u>, 448 F. Supp. 2d 1253, 1268 (N.D. Okla. 2006); <u>Ray v. American Nat. Bank & Trust Co. of Sapulpa</u>, 894 P.2d 1056, 1060 (Okla. 1994).  Chase is entitled to summary judgment on Chapman's claim for tortious interference with contract.

### D.

Plaintiff alleges that Chase committed the tort of abuse of process when it filed a foreclosure action against him in Tulsa County District Court.  The elements of an abuse of process claim are "(1) the improper use of the court's process (2) primarily for an ulterior or improper purpose (3) with resulting damage to the plaintiff asserting the misuse."  <u>Callaway v. Parkwood Village, L.L.C.</u>, 1 P.3d 1003, 1004 (Okla. 2000).  Even if the plaintiff in the predicate action was motivated by malicious intentions, there is not an abuse of process if the plaintiff uses the predicate action for an authorized purpose.  <u>Greenberg v. Wolfberg</u>, 890 P.2d 895, 905 (Okla. 1994); <u>Gore v. Taylor</u>, 792 P.2d 432, 436 (Okla. Civ. App. 1990).  In the context of debt collection, "there is no liability where

---

[10]     Although Chapman applied for refinancing of his mortgage with Harry Mortgage Company, his application was denied and no contract was formed.  This can not be the basis for tortious interference with a contract claim.  Even if the Court were to construe plaintiff's complaint to allege a claim for intentional interference with prospective economic advantage, he could not prevail on that basis either.  To prevail on such a claim, plaintiff must show that he had a "valid business relationship or expectancy, knowledge of the relationship or expectancy on the part of the interferer, an intentional interference inducing or causing a breach or termination of the relationship or expectancy, and resultant damage to the party whose relationship has been disrupted."  <u>Boyle Servs., Inc. v. Dewberry Design Group, Inc.</u>, 24 P.3d 878, 880 (Okla. Civ. App. 2001).  There is no evidence that Chase was aware of Chapman's application with Harry Mortgage Company or that Chase intentionally interfered with that application, and this is not a valid basis for recovery.

process is used for its proper and intended purpose, even if it has a collateral effect of exerting pressure for collection of a debt." <u>Bank of Oklahoma, N.A. v. Portis</u>, 942 P.2d 249, 255 (Okla. Civ. App. 1997).

In this case, Chase filed a foreclosure action against Chapman in Tulsa County District Court.  In his response, Chapman states that "Chase wrongfully instituted foreclosure proceedings against Chapman in this matter."  Dkt. # 163, at 2.  However, the undisputed facts show that Chase had a legitimate purpose when filing the foreclosure action, because Chapman was behind in his mortgage payments at the time the foreclosure action was filed.  Chase was legally authorized to pursue foreclosure, and there is no evidence that Chase pursued foreclosure with an improper purpose.  Therefore, Chase is entitled to summary judgment on plaintiff's claim for abuse of process.

## E.

Chase asserts that plaintiff can not prevail on his claim for wrongful dishonor, because Chase is not a payor under article 4 of the Uniform Commercial Code ("UCC").  Section 4-402 of UCC governs claims for wrongful dishonor.  OKLA. STAT. tit. 12A, § 4-402; <u>Shaw v. Union Bank & Trust Co.</u>, 640 P.2d 953, 954 (Okla. 1981).  "[A] payor bank wrongfully dishonors an item if it dishonors an item that is properly payable, but a bank may dishonor an item that would create an overdraft unless it has agreed to pay the overdraft."  OKLA. STAT. tit. 12A, § 4-402(a).  In this case, Chase is not the payor bank, but is in the position of a creditor seeking to collect on a debt.  If Chapman had a wrongful dishonor claim, it would be against TTCU for refusing to authorize funds for the June 2002 check.  The Court finds that summary judgment should be entered in favor of Chase on Chapman's wrongful dishonor claim.

**F.**

Plaintiff's amended complaint alleges a claim for fraudulent conveyance. The factual basis for this claim appears to be that Chase is attempting to acquire Chapman's property by wrongfully filing a foreclosure action. However, this is not the purpose of a fraudulent conveyance claim under Oklahoma law. Oklahoma has adopted the Uniform Fraudulent Transfer Act to provide a remedy for creditors who are injured when a debtor fraudulently transfers assets to avoid debt collection. See OKLA. STAT. tit. 24, § 112 et seq.; Georgia-Pacific Corp. v. Lumber Prods. Co., 590 P.2d 661, 665 (Okla. 1979); Eskridge v. Nalls, 852 P.2d 818, 820-21 (Okla. Civ. App. 1993). A fraudulent transfer is defined as follows:

> A.   A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> 1.   with actual intent to hinder delay, or defraud any creditor of the debtor . . . .

OKLA. STAT. tit. 24, § 116. In this case, Chase is the creditor and Chapman is the debtor. The Court does not see how Chapman could bring a claim for fraudulent conveyance against Chase, especially when a transfer has not actually occurred. Burrows v. Burrows, 886 P.2d 984, 988 (Okla. 1994) ("The purpose of the Act is to allow a creditor the opportunity to invalidate the transfer of assets made by a debtor if the transfer has the effect of placing assets out of reach of present and future creditors."). Chapman has no factual or legal basis to bring a fraudulent conveyance claim, and Chase is entitled to summary judgment on this claim.

**G.**

Chapman alleges claims for extortion and duress in his amended complaint. However, Oklahoma law does not recognize either extortion or duress as civil causes of action. Oklahoma has

a criminal statute prohibiting "the obtaining of property from another with his consent, induced by a wrongful use of force or fear, or under color of official right." OKLA. STAT. tit. 21, § 1481. However, there is no civil liability for exercising or threatening to exercise a legal right. Paul Hardeman, Inc. v. Bradley, 486 P.2d 731, 733 (Okla. 1971) ("a threat to exercise a legal right cannot be the basis of an action"); Kopp v. Fink, 232 P.2d 161, 166 (Okla. 1951) ("It is never duress to threaten to do that which a party has a legal right to do"); Kizziar v. Pierce, 226 P.2d 941, 943 (Okla. 1951) ("Undoubtedly it is correct that insistence upon enforcement of a lawful right does not constitute duress, intimidation or force."); Peoples Finance & Thrift Co. v. Harwell, 82 P.2d 994, 995 (Okla. 1938) (a creditor's threat to institute legal action to recover mortgaged property can not be the basis for civil liability if the creditor had a lawful right to the property). Oklahoma has not expressly adopted a tort claim imposing civil liability for extortion or duress and this does not provide a basis for recovery.

The Court has found that Chase had a lawful right to institute a foreclosure action against Chapman and, based on Oklahoma law, there is no basis for civil liability. Whether Chapman's claim is called extortion or duress makes no difference, because Oklahoma does not provide a civil cause of action for either. Roberts v. Wells Fargo AG Credit Corp., 990 F.2d 1169, 1174 (10th Cir. 1993) (recognizing duress as a defense to a breach of contract claim but finding that Oklahoma law does not recognize an independent tort for duress); Cimarron Pipeline Constr., Inc. v. U.S. Fidelity & Guar. Ins. Co., 848 P.2d 1161, 1165-66 (Okla. 1993) ("Although, [sic] our decisional and statutory law has inextricably interwoven tort notions within the doctrine of economic duress, we are not compelled to recognize the doctrine of economic duress as a general tort theory."). The

Court finds that summary judgment should be entered in favor of Chase on Chapman's claims for extortion and duress.

## H.

Chapman's amended complaint alleges that Chase breached an implied covenant of good faith and fair dealing. However, the Oklahoma Supreme Court has refused to extend the tort of bad faith to commercial lending. Roberts, 990 F.2d at 1174; Rodgers v. Tecumseh Bank, 756 P.2d 1223, 1226-27 (Okla. 1988). Transactions between a bank and its customer generally fall within the realm of contract rather than tort. RJB Gas Pipeline Co. v. Colorado Interstate Gas Co., 813 P.2d 1 (Okla. Civ. App. 1989) (refusing to extend tort liability outside of the insurance context for bad faith breach of the implied covenant of good faith and fair dealing). Chapman cites no legal basis for this claim and the Court has not found any legal authority that would support a tort claim against Chase for its alleged breach of the implied covenant of good faith and fair dealing.

## I.

Chapman alleges a claim for negligence, but the basis for this claim is not clear. Based on plaintiff's response and the amended complaint, plaintiff could be alleging a negligence claim based on Chase's handling of his mortgage or his allegations that Chase reported inaccurate information to a credit reporting agency. As discussed above, plaintiff's claim for negligence concerning credit reporting is preempted by the FCRA unless plaintiff has evidence that Chase acted with malice or willful intent to injure him. See III(B); 15 U.S.C. § 1681h(e). There is no evidence that Chase acted with malice or with the intent to injure Chapman when it reported that Chapman missed his June 2002 mortgage payment. In fact, this was accurate information. Chapman's negligence claim is preempted by the FCRA to the extent it is based on alleged credit reporting errors.

16

To extent that Chapman's negligence claim concerns Chase's handling of Chapman's mortgage, Oklahoma law treats this claim as a breach of contract claim instead of a negligence claim. The Oklahoma Supreme Court has recognized that a breach of contract claim and a tort claim may arise from the same set of facts when the contract serves as the "mere inducement creating the state of things that furnishes the occasion for a tort." Finnell v. Seismic, 67 P.3d. 339, 344 (Okla. 2003). However, in the commercial loan setting, Oklahoma appellate courts have refused to permit a tort claim arising out a customer's contract with a bank:

> The purpose of a commercial loan . . . is to provide the funds to facilitate the taking of a business risk. Where, as here, there is no special relationship, parties should be free to contract for any lawful purpose and upon such terms as they believe to be in their mutual interest. To impose tort liability on a bank for every breach of contract would only serve to chill commercial transactions. This is not to say that under every fact situation arising from a breach of contract that recovery may never lie. Gross recklessness or wanton negligence on behalf of a party to a contract may call for an application of the theory of tortious breach of contract.

Rodgers, 756 P.2d at 1226-27. Chapman's negligence claim based on Chase's allegedly deficient accounting procedures and improper institution of foreclosure proceedings sounds in contract rather than tort. The parties' obligations arise completely from the contract and Oklahoma law does not permit a bank customer to sue a bank in tort absent gross recklessness or wanton negligence committed by the bank. Mooring Capital Fund, LLC v. Phoenix Central, Inc., 2007 WL 2292462, *6 (W.D. Okla. Aug. 7, 2007); Beshara v. Southern Nat. Bank, 928 P.2d 280, 288 (Okla. 1996).

Chapman has not shown that Chase's conduct rises to the level of gross recklessness or wanton negligence. Chase initiated foreclosure proceedings after Chapman failed to make up his June 2002 payment after two years. Chase had a lawful right to institute foreclosure proceedings

and Chase provided Chapman ample time to make up the missing payment.[11]  This does not even approach reckless or wanton conduct.  Even if Chase had violated the implied covenant of good faith and fair dealing imposed by common law as part of every contract, "a breach of the implied covenant of good faith and fair dealing merely results in a breach of contract."  First Nat. Bank & Trust Co. of Vinita v. Kissee, 859 P.2d 502, 509 (Okla. 1993).  Chapman has not shown any permissible basis for a negligence claim under these facts, and summary judgment should be entered in favor of Chase as to Chapman's negligence claim.

## J.

Chase asserts that there is no evidence of breach of contract by Chase, let alone bad faith breach of contract, as Chapman alleges in his amended complaint.  Chapman does not directly respond to this argument, but he makes scattered references to facts suggesting that Chase failed to credit his account when he timely submitted payments to Chase.  Chapman's response also implies that Chase breached the mortgage agreement by initiating foreclosure proceedings when he had not missed any payments.  Chase argues that the undisputed facts show that it was authorized by the note and mortgage to seek foreclosure when Chapman missed the June 2002 payment.  To the extent that Chapman is alleging that Chase violated the implied covenant of good faith and fair dealing,

---

[11]    In his response, Chapman states that Chase repeatedly misapplied his payments even though he set up an automatic withdrawal from his bank account to alleviate any problems submitting timely payments.  He claims that he was treated rudely when he contacted Chase about alleged missing payments and Chase sent him threatening letters demanding payment. Chase acknowledges that Chapman, through Damilao, attempted to pay with a check-by-phone in February 2003 and Damilao supplied the wrong account number.  Chase has attached a copy of the draft sent to TTCU and it clearly states the wrong account number. Chase has also explained Chapman's allegations that Chase misapplied the January 2004, September 2004, and October 2004 payments.  Even if the Court were to assume that Chase erred by misapplying these payments, these acts do not rise to the level of gross recklessness or wanton negligence.

Chase asserts that Chapman must still tie his breach of contract claim to a specific contract provision.

The contracts at issue are the note and mortgage executed by Pinnacle and Chapman, which were both subsequently assigned to Chase.  In the note, Pinnacle agreed to loan Chapman $58,998 at an annual interest rate of 7.75 percent and, in return, Chapman agreed to make a principal and interest payment of $442.67 on the first day of each month.  Dkt. # 158, Ex. 1, at 1.  The note authorizes the lender to charge a late fee of 4 percent if the payment is not submitted within 15 days of the due date, and if Chapman failed to make a full monthly payment the lender could "require immediate payment in full of the principal balance remaining due and all accrued interest."  Id. at 2.  The mortgage provides that the lender may "require immediate payment in full of all sums secured by this Security Instrument if . . . Borrower defaults by failing to pay in full any monthly payment." Id., Ex. 2, at 2.  Chapman has a right of reinstatement under the mortgage.  The mortgage states that:

> Borrower has a right to be reinstated if Lender has required immediate payment in full because of Borrower's failure to pay an amount due under the Note or this Security Instrument.  This right applies even after foreclosure proceedings are instituted.  To reinstate the Security Instrument, Borrower shall tender in a lump sum all amounts required to bring Borrower's account current . . . .

Id. at 3.

Chase's payment records show that Chapman was one month behind following June 2002. The June 2002 check was returned for insufficient funds, but Chase waited almost two years before initiating foreclosure proceedings against Chapman.  Under the note and mortgage, Chase had a right to foreclose on its security interest in Chapman's home, because he had missed a monthly payment and failed to make up that payment.  The Court can not find, nor has Chapman identified,

any specific contractual provision that Chase violated.  Chapman has also alleged that Chase breached the implied covenant of good faith and fair dealing that is part of every contract under Oklahoma law.  See Worldlogics Corp. v. Chatham Reinsurance Corp., 108 P.3d 5, 7 (Okla. Civ. App. 2004).  The commentary to Oklahoma's commercial code discusses the obligation of good faith in the context of an ordinary commercial contract:

> [Section 1-304] does not support an independent cause of action for failure to perform or enforce in good faith.  Rather, this section means that a failure to perform or enforce, in good faith a specific duty or obligation under the contract, constitutes a breach of that contract or makes unavailable, under the particular circumstances, a remedial right or power.

2005 Commentary to OKLA. STAT. tit 12A, § 1-304.  Oklahoma courts have not treated the implied obligation to act in good faith as a separate basis for contractual liability without evidence that a specific contractual provision has been violated.  Murray v. D & J. Motor Co., Inc., 958 P.2d 823 (Okla. Civ. App. 1998) (interpreting obligation of good faith to mean that a buyer is "entitled to get what he or she paid for"); Frontier Fed. Sav. & Loan Ass'n v. Commercial Bank, N.A., 806 P.2d 1140 (Okla. Civ. App. 1990) (rejecting duty to act in good faith as an independent duty upon which a breach of contract action may be based).  Because Chapman has not shown that Chase breached its contracts in any way, he may not rely on the implied obligation of good faith and fair dealing to support a claim for breach of contract.  Chase is entitled to summary judgment on Chapman's breach of contract claim.

### K.

Chase asserts that Chapman's claim for intentional infliction of emotional distress can not survive summary judgment, because Chapman has no proof of emotional distress.  Chase also argues that its conduct was not wrongful and there is no evidence that Chase engaged in extreme and

outrageous conduct.  Chapman argues that he does not actually have to prove that he suffered emotional distress to support his claim for intentional infliction of emotional distress, because it should be inferred from Chase's actions that he suffered emotional distress.  He also suggests that the Court should "look at what transpired and look at the huge amount of paperwork" to infer that Chase's conduct was extreme and outrageous.  Dkt. # 163, at 3.

A plaintiff alleging intentional infliction of emotional distress must establish the following elements: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the emotional distress was severe.  Trentadue v. United States, 397 F.3d 840, 856 (10th Cir. 2005) (applying Oklahoma law);  Computer Publications, Inc. v. Welton, 49 P.3d 732, 735 (Okla. 2002). Under Oklahoma law, the trial court must assume a "gatekeeper role" and make an initial determination that the defendant's conduct "may be reasonably regarded as sufficiently extreme and outrageous to meet the Restatement § 46 standards." Trentadue, 397 F.3d at 856 n.7.  If reasonable persons could reach differing conclusions in the assessment of the disputed facts, the court should submit the claim to the jury to determine whether the defendant's conduct could result in liability. Id. The court is to make a similar threshold determination with regard to the fourth prong, the presence of severe emotional distress.  Id.

The Court finds that Chase has not engaged in extreme or outrageous conduct that would support liability for intentional infliction of emotional distress.  Even assuming that all of plaintiff's factual allegations were true, there is nothing that suggests that the parties' dispute went beyond a billing dispute.  Breeden v. League Servs. Corp., 575 P.2d 1374 (Okla. 1978) ("bill collectors or collecting creditors have become liable for extreme abuse of the their position.  However, even in

such cases, the bill collectors or creditors have not been held liable for mere insults, indignities, or annoyances that were extreme or outrageous."). Plaintiff alleges that a Chase representative stated "you know you owe the money, so just pay it!" Dkt. # 163, at 5. This does not rise to the level of extreme and outrageous conduct, especially considering that Chase has submitted evidence showing that Chapman was one month behind on his mortgage payments after June 2002. Chase's phone records show that Chase called Chapman on several occasions to discuss the missing payment, but that Chase talked to Chapman only three times between July 23, 2002 and November 25, 2002. Although Chapman may have felt that Chase was harassing him about a payment he did not believe was missing, Chase had a legitimate reason to contact Chapman and its conduct was far from abusive. Chase's conduct was not extreme or outrageous under the circumstances.

The summary judgment record is also devoid of any evidence that Chapman has actually suffered any emotional distress. Chapman cites the following six items from which he suggests the Court should infer severe emotional distress:

> (1) Chase representatives have argued many times with Chapman when Chapman attempted to resolve and issues with Chapman's mortgage; (2) Chapman has been forced to draft huge amounts of paperwork to counter Chase's paperwork; (3) Chase has been unwilling to work with Chapman in order to resolve the dispute; (4) Chapman has spent countless hours being forced to read federal cases in order to respond to Chase; (5) Chapman has spent countless hours in depositions with Chase's attorneys; and (6) Chapman has had to endure five years of grief over these issues.

Dkt. # 163, at 3-4. Most of these claims concern Chase's conduct during the pendency of this litigation. However, Chapman instigated this lawsuit by filing claims against Chase and Chase has a right to vigorously defend against Chapman's claims. The Court has procedures to address claims of litigation misconduct and the docket sheet shows that Chapman has availed himself of these procedures by filing three motions for sanctions against Chase. Dkt. ## 141, 188, 210. Chapman

has not produced any objective evidence that he has suffered any emotional distress outside of this litigation and he certainly has not shown that Chase "intentionally and recklessly caused severe emotional distress beyond that which a reasonable person could be expected to endure." <u>Sturgeon v. Rutherford Publications, Inc.</u>, 987 P.2d 1218, 1227 (Okla. Civ. App. 1999).  Chapman must come forward with specific evidence to prove that he has suffered severe emotional distress and, although his response notes a litany of disagreements between Chase and Chapman, there is no evidence that Chapman has actually suffered emotional distress as a result of the events giving rise to this lawsuit. No reasonable person could find that Chase engaged in extreme and outrageous conduct or that Chapman suffered severe emotional distress, and Chase is entitled to summary judgment on Chapman's claim for intentional infliction of emotional distress.

## L.

Chapman alleges that Chase committed fraud and engaged in a conspiracy to commit fraud.[12] Chase argues that Chapman can not prove any of the elements of fraud by clear and convincing evidence and summary judgment should be granted against Chapman on this claim.  Chapman does not specifically address this argument in his response, and the basis for his fraud claim is difficult to discern.  Construing his amended complaint broadly, it appears that Chapman is alleging that Chase fraudulently reported inaccurate credit information and that Chase misrepresented his payment history.

---

[12]   Chase is the only defendant remaining in this lawsuit and Chapman has not identified another actor that took part in the alleged conspiracy.  In the civil context, a conspiracy "consists of a combination of two or more persons to do an unlawful act, or to do a lawful act by unlawful means."  <u>Roberson v. PaineWebber, Inc.</u>, 998 P.2d 193, 201 (Okla. Civ. App. 1999).  Chapman has not identified a second actor and there is no possibility that Chapman can succeed on a claim of conspiracy to commit fraud.

Under Oklahoma law, plaintiff must prove four elements to prevail on a claim of fraud: "(1) a false misrepresentation of a material fact, (2) made as a positive assertion either known to be false or recklessly made without knowledge of the truth, (3) made with the intention of causing the other party to act, and (4) which is relied on by the other party to his or her own detriment." Gish v. ECI Servs. of Oklahoma, Inc., 162 P.3d 223, 228 (Okla. Civ. App. 2006). "Fraud is never presumed and each of the elements must be proved by clear and convincing evidence." Bourke v. Western Bus. Prods., Inc., 120 P.3d 876, 886 (Okla. Civ. App. 2005). "[T]he law presumes honesty and fair dealing, and fraud may not be inferred from acts which are consistent with honesty of purpose." Madill Bank & Trust Co. v. Herrmann, 738 P.2d 567, 571 (Okla. Civ. App. 1987).

The Court finds no evidence that Chase made a material misrepresentation of fact. The summary judgment record supports Chase's assertion that Chapman's June 2002 check bounced and that Chapman was subsequently one month behind on his mortgage payments. Chase did not make a misrepresentation of fact when it attempted to collect the missing payment from Chapman or when it reported this information to a credit reporting agency. Chase has also explained Chapman's allegations that Chase mishandled his February 2003, January 2004, September 2004, and October 2004 payments and, assuming that Chase made an incorrect statement to Chapman concerning his payment status, there is no evidence that would permit the Court to infer that Chase knew any statements to be false or acted with reckless disregard of the truth. At most, the summary record shows that Chase and Chapman were engaged in a billing dispute and that Chase had a good faith basis to assert that Chapman was behind on his mortgage payments. Chapman has not asserted, let alone proven, any facts that would permit him to recover on a fraud claim, and Chase is entitled to summary judgment on this claim.

**IV.**

**IT IS THEREFORE ORDERED** that Defendant Chase Manhattan Mortgage Corporation's

Motion for Summary Judgment and Brief in Support (Dkt. # 158) is **granted**.  A separate judgment

is entered herewith.

**IT IS FURTHER ORDERED** that Chase Manhattan Mortgage Corporation's Motion to

Strike Plaintiff's "Response" to Chase's Reply in Support of Its Motion for Summary Judgment

(Dkt. # 201) is **granted**, and Chapman's sur-reply (Dkt. # 195) is **stricken**.

**DATED** this 24th day of September, 2007.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT